**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

ASSIAH PHINISEE, A Minor, by and    :
through RASHEENA PHINISEE, the    :
Parent and Natural Guardian, et al,    :
                                :
         Plaintiffs,    :     Civil Action No. 10-1253
                                :
     v.    :
                                :
UNITED STATES OF AMERICA,    :
                                :
         Defendant.    :

## ORDER

       Pending before the Court is defendant United States of America's Motion to Enforce the

Settlement Agreement (Dkt. No. 49). Defendant has informed the Court that the Acting

Assistant Attorney General has approved the settlement in the amount of One Million Two

Hundred Thousand Dollars ($1,200,000.00), subject to the terms and conditions of the

Stipulation for Compromise Settlement and Release ("Stipulation") attached as Exhibit B to said

motion, including court approval on behalf of the minor plaintiff, and further subject to the

Court's determination that the settlement is binding on plaintiffs.

       AND NOW, this _____ day of _____, 2012, having reviewed and

considered defendant's motion to enforce the settlement agreement, plaintiffs' responses thereto,

the June 6, 2012 testimony, and the parties' briefs in support of their positions, the Court finds

that the parties entered into a valid and binding settlement on April 19, 2012. Therefore, IT IS

HEREBY ORDERED that defendant's motion to enforce the settlement agreement is

GRANTED.

BY THE COURT:

_____

HONORABLE JACOB P. HART
*Magistrate Judge, U.S. District Court*

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ASSIAH PHINISEE, A Minor, by and through RASHEENA PHINISEE, the Parent and Natural Guardian, et al, | : : : : | |
| Plaintiffs, | : | Civil Action No. 10-1253 |
| v. | : : | |
| UNITED STATES OF AMERICA, | : : | |
| Defendant. | : | |

**DEFENDANT UNITED STATES OF AMERICA'S POST-HEARING BRIEF IN
SUPPORT OF ITS MOTION TO ENFORCE THE SETTLEMENT AGREEMENT**

I.   **INTRODUCTION**

The parties settled this complicated medical malpractice case on April 19, 2012.  The

case was mediated before an experienced and expert Magistrate Judge.  Plaintiffs Assiah and

Rasheena Phinisee were represented by seasoned and competent medical malpractice counsel

throughout the litigation.  The $1.2 million settlement reflects a balance between plaintiffs'

significant litigation risk on liability and defendant's risk of a potentially high damages award in

a case where a child had undergone a liver transplant.  Undoubtedly, the settlement is in the best

interests of young Assiah Phinisee, who risks receiving nothing should this settlement be set

aside and the case proceed to trial.

The attempts by Assiah's mother to set aside the settlement are misguided and without

merit.  First, Phinisee claims that the settlement was not final because it required DOJ approval.

This argument needs little attention as it is undisputed the parties agreed to this precise condition,

and its asymmetrical nature – the fact that there is no similar condition as to the plaintiffs – has

no legal significance.  Second, Phinisee asserts that she did not learn until after the settlement

1

that a Medicaid lien of approximately $705,000 must be partially paid back to the Pennsylvania Department of Public Welfare. As an initial matter, the Court is not required to reach this issue because Phinisee gave express authority to her attorneys to settle the matter. Even assuming she had a "misunderstanding" about the lien and how the settlement money would be allocated, such a misunderstanding cannot serve as the basis to set aside an agreement that was legally binding on her. Moreover, Phinisee's testimony that she did not know about the lien is simply not credible in light of the evidence before the Court. Rather, the evidence reflects Phinisee's ill-advised change of heart that she could perhaps have gotten a better deal. Finally, the Court should reject Phinisee's claim that the settlement should be set aside because it contains no portion specifically attributable to her own claims as opposed to Assiah's. It is undisputed that Phinisee discussed the issue of her own alleged claims both with her counsel and with the settlement judge, before agreeing to the deal. She cannot change her mind simply because she now believes, belatedly and incorrectly, that there is a theory to support her own claim for damages.

In sum, the Court should enforce this valid settlement, and put an end to years of zealous litigation, in a manner that benefits the best interests of a young and vulnerable Assiah Phinisee.

## II.    FACTS

### 1.  The parties' April 19, 2012 settlement

On April 19, 2012, the parties and Magistrate Judge Thomas J. Rueter mediated this case to a successful conclusion. This mediation lasted nearly an entire day. During the course of the day, Judge Rueter met with the parties together and numerous times met privately with counsel, as well as with Rasheena Phinisee. The parties explored various monetary solutions. Plaintiffs' initial demand was $8 million; defendant offered $250,000 the day before the conference; and

2

plaintiffs made a counter-demand of $7.75 million at the outset of the conference. The parties engaged in many back and forth sessions and exhaustive discussions about the risks of litigation, possible ranges of damages awards, and benefits of settlement.

After many hours of negotiations, Judge Rueter expressed his view that the government faced serious litigation risk regarding the standard of care. Even more significantly, given the plaintiffs' burden of proof, Judge Rueter expressed his view of the extremely high likelihood that plaintiffs may lose the entire case, perhaps as early as the summary judgment stage, due to the causation element of Assiah's claim. Based on expert life care plans and economic reports from both sides, the parties were well aware of a potentially significant damages award if plaintiffs prevailed on liability.

The government, at Judge Rueter's recommendation, offered $1.2 million based on his informed representation that plaintiffs would accept such a sum. Judge Rueter communicated the $1.2 million offer in a meeting with Phinisee and her counsel. Plaintiffs accepted the government's offer of $1.2 million to resolve all claims in this case. Phinisee says, "They told me that the deal had increased from 250,000 to 1.2 million. And I was excited. I was." Testimony of Rasheena Phinisee, hearing transcript, p. 112. (Excerpts from hearing transcript attached as Exhibit A). At that point, her counsel advised her to "Take the deal," and Phinisee "said okay." Id. at 113. When asked if she gave her attorneys authority to accept the $1.2 million, she responded: "Yes, after I had been told that we couldn't get anymore." Id. at 125. At the close of the conference, Phinisee gave Judge Rueter a picture of Assiah, on the back of which she thanked him "for his help and success in negotiating this case." Spencer testimony, p. 75; see also email from Gil Spencer, Exhibit D, p. 6 of Phinisee's Motion to Strike, Dkt. No. 61.

Judge Rueter informed the Court that an agreement had been reached. Counsel met with the Court in chambers and confirmed that an agreement had been reached. On April 19, 2012, the Court entered an order (Dkt. No. 43) placing the case in civil suspense because the case had been settled.

    2. <u>Phinisee's refusal to sign settlement papers and the government's motion to enforce</u>

The government sent settlement papers to Phinisee's counsel on April 26, 2012. (Attached as Exhibits A and B to defendant's original motion to enforce the settlement agreement, Dkt. No. 49). On or about May 1, 2012, her counsel advised defendant's counsel that Phinisee refused to sign the settlement papers. The United States therefore filed a motion to enforce the settlement agreement reached by the parties. Plaintiffs' former counsel filed a response in support of defendant's motion to enforce the settlement agreement. Phinisee opposed the motion to enforce and filed her own motion to set aside the settlement. She also filed motions to discharge her attorneys.

    3. <u>The June 6, 2012 hearing</u>

The Court held a hearing on the parties' motions on June 6, 2012. Phinisee ostensibly raised three arguments to set aside the settlement: (1) that the settlement was not final because it was subject to approval by the DOJ Assistant Attorney General ("AAG") for the Civil Division; (2) that she did not know about a Department of Public Welfare ("DPW") lien that would require some of the settlement proceeds to reimburse DPW for payments made for her daughter's medical care; and (3) that the settlement did not provide for any of the monies to be attributed to Phinisee's own claims, as opposed to her daughter's. Phinisee testified, along with her former attorneys Gil Spencer and Derek Layser. AUSA David Degnan testified about the limited issue regarding the settlement's condition of approval by the AAG.

4.   <u>Statements about litigation risk and fairness and adequacy of the settlement</u>

Layser, Spencer and Phinisee testified extensively about the merits of the settlement, in

particular about plaintiffs' significant litigation risk.  In her pre-hearing motion to strike

defendant's motion to enforce (Dkt. No. 61), Phinisee described Judge Rueter's analysis of the

case during the April 19, 2012 settlement conference:

> The Judge then went on to explain...:that the motion of summary
> judgment would probably stop a trial from happening because the
> issues with liability.  That while Judge Hart was a good Judge he
> was very tough and would probably rule in favor of the defense on
> the Motion for Summary Judgment.  He also said that the
> probability of the plaintiff winning in through (sic) trial would be
> extremely difficult.  So it was in the best interest to the plaintiff
> and her daughter to obtain a good settlement offer rather than a bad
> verdict.

Docket 61, p. 2.

She reiterated this during her hearing testimony:

Q:    You understood at the hearing - - I'm sorry, at the settlement conference that if
      the case did not settle and the case went forward, that the Government might win?
A:    Yes.
Q:    And that you would get nothing?
A:    Yes.
Q:    And that your daughter would get nothing?
A:    Yes.
Q:    Your lawyers explained that to you, didn't they?
A:    Yes.
Q:    And Judge Rueter explained it as well?
A:    Yes.
Q:    And you understood that Judge Rueter had expressed the view that the
      Government, that the case might not even get to trial because the Government
      would win on summary judgment papers?
A:    Yes.

Hearing transcript, p. 124, lines 6-22 (Exhibit A).

In her motion to strike, Phinisee recounted her attorney's assertion that if the case went to trial, plaintiffs would have difficulty disputing defendant's expert Dr. Schwarz "because of her credentials." Dkt. No. 61, p. 3. Attached to that motion Phinisee included an email exchange with her counsel, in which Spencer reminded her of Judge Rueter's advice to settle "because of the defense claim, and the defense expert reports and qualifications…." Id. at Exhibit D, p. 5.

Spencer described his discussion with Phinisee during the April 19, 2012 conference about why the settlement amount was a good result:

> The majority of our discussion focused really on the medicine, on the issues in the case and the likelihood of success with the case. That was our big problem. I absolutely agree that from a damage perspective, the damages were much higher than 1.2. If we could assume liability and go straight to damages, it would be much higher. But there was a substantial concern on my part with regard to liability….

Hearing transcript, p. 79. He repeated these concerns when the Court questioned him about the bifurcation decision in the government's favor:

> Q:    So she knew that if the Court ruled against her on liability, the damage issue would never even come up?
> A:    Judge, we did, and we also gave some indications of kind of what we thought, reading tea leaves. We had no specific knowledge of what would happen, but kind of reading tea leaves and projecting, that was a matter of concern...

Id.

When questioned about whether he thought the settlement was in Assiah's best interests, Spencer stated, "Not only did I believe it, I firmly believe it today, and I will continue to believe that." Id. at 80. As Spencer explained, a case "is never settled for quote, "full value" based upon damages only….[M]y job was to get the most money I reasonably could" given his "evaluation on the likelihood" of success. Id. Based on his "over 35 years experience" Spencer "felt this was a fair settlement. And very much in the child's best interest." Id.

6

5.  <u>Testimony about the Medicaid lien, trusts for minors, and Phinisee's own claim</u>

Phinisee's counsel both testified that they discussed the Medicaid lien with her at the

settlement conference, before she accepted the United States' $1.2 million offer.  Layser has

been a medical malpractice attorney since 1989; he testified that "it's rare now that I don't have a

case where there is some lien…." Hearing transcript, p. 28.  He explained his typical discussion

with clients regarding liens:

> The bad news is we have to pay this lien back, whether it's
> Medicaid or Medicare, those are Government liens.  They're in the
> statutes…. At the end of the case, the bad news is we have to pay
> the money back.  The good news is that they will negotiate….
> There is a complicated formula based on our fees, based on our
> attorney's fees and the cost.  Medicare is usually about 63, 64 cents
> on the dollar.  Medicaid is more of a negotiation.  At times they
> will reduce even further.

<u>Id.</u>, p. 29, lines 4-17.

With regard to this particular case, Layser described his discussion with Spencer and

Phinisee: "I gave the speech that I talked about before.  Look, the bad news is we're going to

have to pay Medicaid back.  The good news is they're going to reduce it." <u>Id.</u> at p. 32, lines 22-

24.  Layser was questioned further on the issue of the lien:

> Q:   But at any rate [Phinisee] was completely aware of the implications of a lien
>        before granting you authority to settle the case?"
> A:   Oh, absolutely.

*Id.* at 38.

Spencer likewise testified that they discussed the Medicaid lien with Phinisee at the

settlement conference before accepting the $1.2 million offer: "And I remember Mr. Layser, it

was either he or I, one of us said we need to discuss the lien.  And one of the things that really

sticks out in my mind is her response was, 'You mean the 705,000.'" <u>Id.</u> at 71-72.  When

questioned further on this topic, Spencer stated:

> Q:     Just to summarize.  Ms. Phinisee knew at the time of the mediation, and before any final offer was communicated to her, that there was a lien in the amount of approximately $705,000?
> A:     Yes.
> Q:     She knew that, correct?
> A:     She knew that, apparently had even looked at the piece of paper seeing that.
> Q:     And before you accepted the offer, sometime that morning you and Mr. Layser had a conversation with, at least one conversation with Ms. Phinisee explaining to her that the lien, that Medicaid could recover no more than one-half of the net?
> A:     Yes.

Id. at 78; see also p. 81, lines 19-22 (Q: But at any rate, the process….of negotiating with

Medicaid was discussed with Ms. Phinisee before acceptance of an offer?  A: Oh, absolutely.).

Layser further explained that a DPW lien can *never* be negotiated until the settlement is

complete and that no plaintiff ever knows the exact amount they will receive until after the fact:

"[Medicaid] won't give you a definite number until you have a settled case, inform them of the

final number, inform them of your fee and inform them of your final cost."  Id. at 50; see also

Spencer testimony, p. 70, lines 7-8 ("….DPW will not pre-negotiate with you so you can't sit

down with specifics.").

Phinisee likewise testified that she knew the amount of the lien before giving her

attorneys authority to settle the case.  As she explained:  "Derek left his file on the table with me,

and I peeked through the file, and one of the documents had writing on it that stated that

Medicaid had paid out some 700 and some odd thousand dollars."  Hearing transcript, p. 122.

Although she disputes that she understood the purpose of the lien, notably, the document

Phinisee reviewed reflects that the $704,914.12 is "Reimbursement to DPW."  (See Statement of

Claim Summary attached as Exhibit B).

Judge Rueter and her attorneys further advised Phinisee that she did not have a claim in

her own right, and that the money from the settlement would benefit her minor daughter through

a trust.  (Docket No. 61, p. 2, and Docket No. 62, p. 1).  Indeed, Phinisee specifically asked

about how a Special Needs Trust might work: "I asked him about if the case settled for a million dollars, for example, how would that work in trust, would I be able to pay for things like school tuition, different activities for Assiah to be able to participate in...." Hearing transcript, pp. 111-112. In response, Judge Rueter advised her: "[T]hose things you need to talk to with Derek because I'm pretty sure he has a really good trust team that could outline those different things for you in a trust." Id. at 112.

### 6. Testimony about the condition requiring DOJ approval

The condition for DOJ approval was known by every person at the settlement conference. Phinisee testified that she understood that settlements over a certain amount had "to go through different chains....of approval." Hearing transcript, p. 126. Spencer testified that he was aware of the DOJ approval condition, saying that he "was familiar with a lot of those bureaucratic steps," Id. at 74, and believed that it would be approved. Id. at 93. At no time did he believe this approval meant that the settlement was tentative; rather, when asked if he believed on April 19, 2012 that the parties had reached a binding settlement agreement, he responded, "Absolutely." Id. at 92-93; see also Layser testimony, p. 65, lines 21-24, and Degnan testimony, p. 100, lines 16-19.

## III.   ARGUMENT

### A.   Standard of Review

At the June 6, 2012 hearing, the Court stated its intention to treat this matter as an application by Phinisee to set aside the settlement pursuant to Local Rule 41.1(b). Hearing transcript, pp. 3-4). The Rule states, in pertinent part:

> Whenever in any civil action counsel shall notify the Clerk or the judge to whom the action is assigned that the issues between the parties have been settled, the Clerk shall, upon order of the judge to whom the case is assigned, enter an order dismissing the action

with prejudice, without costs, pursuant to the agreement of
counsel. Any such order of dismissal may be vacated, modified, or
stricken from the record, for cause shown, upon the application of
any party served within ninety (90) days of the entry of such order
of dismissal.

Local Rule 41.1(b).[1]

Under the Rule, it is plaintiffs' burden to show that there is cause to set aside the

settlement.

Settlement is a judicially favored manner to terminate litigation. See Petty v. General

Accident Fire & Life Assurance Corp., 365 F.2d 419, 421 (3d Cir. 1966). It is well settled that

"[a] district court has 'inherent authority to enforce agreements settling litigation before it.'"

McClure v. Township of Exeter, 2006 WL 2794173, at *1 (E.D. Pa. Sept. 27, 2006) (quoting

New Castle County v. U.S. Fire Ins. Co., 728 F. Supp. 318, 319 (D. Del. 1989)). "Provided that

the evidence demonstrates that the parties reached an agreement, a district court can enforce the

terms agreed upon by the parties." Id. A hearing may be needed if factual and credibility

determinations are involved as to whether an attorney was authorized to enter into a settlement

agreement on his client's behalf. See Garabedian v. Allstates Engineering Co., 811 F.2d 802,

803 (3d Cir.1987).

"An agreement to settle a lawsuit, which is voluntarily entered into, is binding upon the

parties, whether or not made in the presence of the court, and even in the absence of a writing."

Sanford v. Ciccone, 2009 WL 101693, at *8 (E.D. Pa. 2009); McClure, 2006 WL 2794173, at *2

---

[1] Although L.R. 41.1(b) employs the word "cause," the cases in our District have frequently
required a showing of "good cause" (emphasis supplied.) See, e.g., Wyndmoor Learning Ctr. V.
City of Wilmington, 1996 WL 117741 at *7 (E.D. Pa.) ("good cause"); Bibawy v. Ball, 1994
WL 523214 at *3 (E.D. Pa.)( same); Capital Controls Co. v. Aetna Cas. & Sur. Co., 1989 WL
167396 at *2 ( E.D. Pa.) ("change of heart" is not "good cause"); Maree v. Reebok U.S.A. Ltd.,
Inc., 1989 WL 41376 at *2 ("just cause");  Fulton v. Amoco Oil Co., 1988 WL 74961 at *1 (E.D.
Pa.) ("good cause").  Except for Wyndmoor, these cases involve the earlier L.R. 23(b) which, in
pertinent part, was verbatim the same as the current L.R. 41.1(b).

(E.D. Pa. Sept. 27, 2006) (enforcing the verbal settlement agreement and holding it was immaterial that plaintiff refused to sign the settlement papers). To determine that a valid settlement agreement has been entered into, the Court must find that both parties mutually assented to the terms and conditions of the settlement at the time the agreement was made. See Wyndmoor Learning Ctr. v. City of Wilmington, 1996 WL 117471, at *6 (E.D. Pa. March 12, 1996).

A party's change of heart after the fact cannot derail the party's obligations under a settlement. Counsel can enter into a verbal settlement agreement which remains binding on the party "even if it is clear that a party had a change of heart between the time he agreed to the terms of the settlement and when those terms were reduced to writing." Pugh v. Super Fresh Food Markets, Inc., 640 F. Supp. 1306, 1308 (E.D. Pa. 1986); see also Wyndmoor Learning Ctr., 1996 WL 117471, at *6 (E.D. Pa. March 12, 1996) ("[A] settlement agreement is still binding even if it is clear that a party had a change of heart between the time he agreed to the terms of the settlement and when those terms were reduced to writing."); Suber v. Peterson, 2006 WL 1582312, *2-*4 (E.D. Pa. June 2, 2006) (plaintiff expressly authorized her attorney to enter into a settlement and plaintiff was bound to that agreement even though the settlement was never reduced to writing).

There is a rebuttable presumption that a settlement entered into by an attorney was authorized by the client. Buchanan v. West Whiteland Township, 2009 WL 879038 (E.D. Pa. March 31, 2009), citing Garabedian v. Allstates Engineering Co., 811 F.2d 802, 803 (3d Cir. 1987). However, once the presumption is challenged, the court must find the attorney had express authority to settle. Id. "When the determination whether an attorney was authorized to settle a case hinges on factual issues and credibility determinations, a hearing should be held."

11

Id., quoting Transport International Pool, Inc. v. Alternative Transport, Inc., Civil Action No. 07-2895, 2008 WL 2550598, at *6 (E.D. Pa. June 25, 2008).

 **B.**  **There Is No Cause To Set Aside the April 19, 2012 Settlement**

    1. <u>There is no cause to set aside the settlement agreement based on the condition of DOJ approval</u>

As a threshold matter, Phinisee argues that the settlement agreement was not binding on her because it was subject to approval by the DOJ Assistant Attorney General, since the amount exceeded $1 million. This argument has no merit, as the parties and their counsel were all aware and specifically agreed to the condition the agreement needed to be approved by higher DOJ officials. <u>See</u> June 6, 2012 hearing transcript, pp. 41-42; p. 65 lines 15-24. Likewise, the parties and their counsel understood that the settlement agreement would need Court approval because Assiah is a minor. Finally, the parties and their counsel all understood that the settlement money would be put into a trust created for Assiah. <u>Id.</u> at 111-112; p. 123, lines 13-25. Most importantly, the condition of DOJ approval was itself a part of the overall agreement that was reached at the April 19, 2012 settlement conference. Attorneys Layser and Spencer, as well as AUSA Degnan, all testified that the requirement of DOJ approval was a part of the final settlement agreement. <u>Id.</u> at 65, 74, 93 and 100. It is not relevant that the condition was unique to the government and that there was no parallel condition that attached to plaintiffs.

The essential term of the settlement was the monetary figure of $1.2 million. The fact that the agreement is subject to approval pursuant to federal regulations does not alter the essence of the bargain. Moreover, Phinisee, through her counsel, explicitly agreed that the settlement amount was subject to the condition of DOJ approval. <u>Id.</u> In other words, there was a mutual meeting of the minds between plaintiffs and the government, and the conditional nature of the monetary amount was itself a part of that agreement. Even Phinisee understood that there were

"other approvals" necessary when she accepted the government's offer. Id. at 126, lines 13-16 (Q: You understood that there were these other approvals when you accepted the agreement? A [Phinisee]: Yes.).

In Phinisee's "Motion to Strike Defendant's and Undersigned Counsel's Motion to Enforce Settlement" (Dkt. No. 61), she argues that the agreement reached on April 19, 2012 was only a "tentative agreement." Dkt. No. 61, p. 5. Given her change of heart regarding the terms of the settlement, it is understandable that Phinisee would hope that the agreement was only tentative. However, the record is clear that a final agreement was reached at the conclusion of the settlement conference. Plaintiffs' attorneys believed plaintiffs to be bound by the agreement, and both the Magistrate Judge and this Court understood that the parties had reached a final agreement. At the mediation with Judge Rueter, it was never suggested that the agreement was only tentative. Likewise, at the June 6, 2012 hearing, there was no testimony that the settlement agreement was tentative. To the contrary, plaintiff's former counsel were adamant that the agreement reached on April 19, 2012 was binding and final. See hearing transcript, pp. 64, 92-93.

The fact that the agreement here bound the plaintiffs, as well as the fact that the agreement incorporated the condition of DOJ approval, distinguishes this case from Atasanoff v. Lower Dauphin Sch. Dist., Civ. No. 05-513, Dkt. No. 59 (M.D. Pa. Feb. 14, 2006).[2] Atasanoff, the case on which Phinisee chiefly relies, involved a motion to enforce a settlement agreement filed by a defendant school district following mediation with the plaintiff. In Atasanoff, it was undisputed that the parties had only reached a "tentative" agreement. See Atasanoff, attached as Exhibit C, p. 1. The tentative agreement reached by the parties was subject to approval by the

---

[2] This case does not appear to have been published, nor is it available through Lexis or Westlaw. Accordingly, a copy of this decision is attached hereto as Exhibit C.

local school board. Prior to that approval, the plaintiff informed the defendant that he would only accept an agreement subject to additional conditions. Id. at p. 2. The school district rejected those additional conditions, but the school board approved the original tentative agreement and then moved to enforce that agreement with the Court. In denying the school board's motion to enforce, the Court found that the tentative agreement did not manifest an intention to be bound by the agreement. Id. at p. 5. Other than the fact that it involved a government entity, Atasanoff is inapposite. The critical fact in Atasanoff, in contrast to the circumstances here, was the explicitly tentative nature of the oral agreement reached at the mediation. There was nothing tentative about Phinisee's obligation under the April 19, 2012 agreement. Rather, the parties reached a final agreement that happened to include the condition requiring DOJ approval. As discussed above, this condition was incorporated into the agreement.

The Court in Atasanoff also observed that it was within the power of the school board to send a representative to the mediation who had absolute authority to enter into a settlement agreement. Id. at p. 8. However, that option is simply not possible in cases involving the Department of Justice, which number in the thousands and are litigated in every federal district court in the country. Moreover, as discussed above, federal regulations provide that only the Assistant Attorney General (AAG) has authority to approve settlements such as the one here. Thus, it would place the federal government at a disadvantage – and disincentivize participation in settlement conferences – if a plaintiff could rescind on any agreement prior to DOJ approval. The Court observed as much during the hearing on the motion to enforce the settlement:

> And by the way, I will point out that if I agree with you [plaintiff's counsel], what that means is that every single settlement from now till the end of the world involving a claim under the Federal Tort Claims Act against the United States, every single settlement

agreement can be walked away from by a plaintiff if it's done between the day of the settlement and the day of the approval. . . . If you're correct that every single one of those settlement agreements is not a firm offer until it's approved, if you're right, then a plaintiff who settles with the Government, will always have the right, not just your client, but any plaintiff who settles with the Government, will have a right to walk away from that settlement if they do it before the date of that approval. So if it takes a month, every plaintiff has a month to change their mind.

Hearing transcript, p. 102.

Finally, under Pennsylvania law, there is a line of cases holding that there is an implied requirement of good faith in contracts that require one side to fulfill a condition. Courts have found that such contracts do not give the party tasked with fulfilling the condition arbitrary or unlimited control over the contract and thus are not illusory because of the implied good-faith requirement. Huang v. BP Amoco Corp., 271 F.3d 560 (3d Cir.2001) is instructive. In Huang, the Third Circuit was tasked with deciding whether the district court erred in granting summary judgment regarding whether Amoco, the defendant, acted in good faith when it sought to terminate a 15–year ground lease on the basis of an approvals contingency clause. In Huang, the Third Circuit confronted the underlying question of whether an unambiguous approvals contingency clause could give a lessee an absolute right to terminate the lease or whether that right was tempered by the duty of good-faith and fair dealing. Id. at 564–65. Examining Pennsylvania law, the Third Circuit rejected the idea that contract language alone controlled, and determined that "[b]ecause of the implied covenant of good faith, an approvals contingency clause does not give a lessee an absolute right to terminate the lease without penalty. Rather, the lessee must make a diligent and good-faith effort to obtain the required approvals." Id. at 565.

15

The government here acted in good-faith to obtain approval of DOJ.  There is no evidence that the government did not make timely and diligent efforts to obtain DOJ approval of the settlement agreement, and there is no allegation of fraud or bad faith on the part of the government.[3]  Accordingly, the condition of DOJ approval, which was incorporated into the final oral agreement on April 19, 2012, does not give Phinisee the right to renege on that agreement.

> ### 2. There is no cause to set aside the settlement where Phinisee gave her attorneys express authority to enter into a binding agreement.

Phinisee gave her attorneys express authority to settle this case in the presence of a judicial officer on April 19, 2012, and plaintiffs are bound by the terms of that settlement.  Phinisee cannot reasonably argue that her counsel lacked full and express authority to settle the case.  See Phinisee testimony, p. 125 (Q: ....you gave your attorneys your authority to accept the $1.2 million, is that correct?  A: Yes....), Layser testimony, p. 37 (Q: And at that time did she give you full authority to accept the offer and settle the case?  A: Absolutely.), and Spencer testimony, pp. 78-79 (Q: And did she authorize you and Mr. Layser to accept that offer on her behalf?  A:  Yes, and without hesitation and enthusiastically.).  Phinisee was present during the negotiations, and her willingness to accept the offer was confirmed by Judge Rueter.  See Edwards v. Born, Inc., 792 F.2d 387, 390 (3d Cir. 1986) (the party disputing the settlement must prove that the attorney had "no right to consent to its entry").

The express authority Phinisee granted her attorneys to settle the case was not altered by any alleged misunderstanding she had about the lien or uncertainty about the final amount her daughter would receive.

---

[3]  Indeed, as the United States notified the Court on June 5, 2012, pursuant to 28 C.F.R. §§ 160 and 168, the Acting Assistant Attorney General has now authorized the settlement based upon the terms and conditions of the Stipulation, including approval by the Court with respect to the minor plaintiff, and subject to the Court determining that Plaintiff's acceptance on April 19, 2012 was binding.

Express authority to settle a matter cannot be undermined by a collateral condition, or a unilateral misunderstanding between a client and her own counsel. See Hyde Park Union Church v. Curry, 942 F.Supp. 360, 363 (N.D. Ill. 1996) (upholding the parties' settlement as binding and finding that "[a] unilateral mistake or misunderstanding is not sufficient to compel recision of a settlement agreement where counsel for the parties accepted the settlement terms on behalf of their clients.") (citations omitted). As the Court in Hyde Park noted, "defeated expectations do not entitle a party to repudiate promises made to opposing parties or the court." Id.

Here, the United States agreed to pay $1.2 million to the Phinisees in exchange for releases of plaintiffs' claims. The settlement included no term relating to the amount of the Medicaid lien. Even assuming that Phinisee misunderstood the significance of the lien, her unilateral mistake has no bearing on the validity of the settlement. See also Flood v Ty, Inc., 2005 WL 994579 at *11 (N.D. Ill. April 5, 2005) (upholding the parties' settlement as binding and finding that the $120,000 payment and mutual releases "were the only essential and material terms of the settlement agreement – in fact, they were basically the only terms of the settlement agreement."). See also Bamgbose v. Delta-T Group, Inc., 2011 WL 6150599 (E.D. Pa. Dec. 12, 2011) (McLaughlin, J.) (granting motion to enforce settlement where attorney had authority to settle a matter despite client's apparent belief that the settlement was merely conditional.).

Moreover, the record evidence is undisputed that Medicaid negotiations always occur after the settlement:

> Q:   [I]s DPW generally willing to offer an opinion about how much they may negotiate a lien based on a hypothetical settlement rather than an actual settlement?
> A:   No. The process is you tell them there's a settlement, and then you start the negotiation."

Layser testimony, hearing transcript, p. 34. See also id. at 33 ("Once there was a settlement, we would tell them what the settlement numbers were, what the attorney's fees were, what our costs were. We would then get a number back from them."), and 50 ("[Medicaid] won't give you a definite number until you have a settled case, inform them of the final number, inform them of your fee and inform them of your final cost.").

Judge Schiller's McKinney case, discussed at the hearing, is a prime example of the standard practice of negotiating Medicaid liens after settlement. McKinney v. Philadelphia Housing Authority, 2010 WL 3364400 (E.D. Pa. August 24, 2010). In McKinney, plaintiffs settled their case for $11,913,000.00 and the Medicaid lien was $1,265,896.16. Id. After the settlement, plaintiffs argued that the lien should be measured as a percentage of actual damages, and that the lien should therefore be reduced to approximately $200,000. Id. Judge Schiller reached his own calculation about the appropriate lien amount and reduced it to $537,448.43. Id. McKinney confirms the undisputed testimony at the hearing – lien calculations are separate and apart from the determination of a case's value, based on weighing litigation risk and potential damages. Indeed, the settlement agreement in this case makes no mention of the lien. (See Exhibit B to government's original motion to enforce).

In sum, Phinisee gave express authority to settle this case for the best terms that could be extracted under the circumstances and given the serious litigation risk. Her authority was clear and unambiguous, and she did not withdraw her authority at any time. Any alleged misunderstanding about the lien is outside the scope of the settlement, based on the undisputed testimony in the record.

### 3. There is no cause to set aside the settlement due to Phinisee's alleged misunderstanding about the Medicaid lien

Phinisee claims that she was unaware of a Medicaid lien against the settlement proceeds, and that her alleged ignorance of the lien is grounds to set aside the settlement agreement. As discussed above, the Court can uphold the settlement based on Phinisee's grant of express authority to her attorneys. But if the Court decides that that Phinisee's knowledge of the lien is relevant, the testimony is clear that she knew about the lien before entering into the settlement.

Layser and Spencer both confirmed that Phinisee knew about the lien. Spencer testified: "And I remember Mr. Layser, it was either he or I, one of us said we need to discuss the lien. And one of the things that really sticks out in my mind is her response was, 'You mean the 705,000.'" Hearing transcript, pp. 71-72.

Her counsel could not have been more clear that they discussed the lien with Phinisee before settling the case. Layser told Phinisee at the settlement conference, "the bad news is we're going to have to pay Medicaid back. The good news is they're going to reduce it." Id. at p. 32. Layser further testified on this topic:

> Q:    But at any rate [Phinisee] was completely aware of the implications of a lien before granting you authority to settle the case?"
> A:    Oh, absolutely.

Id. at 38.

Spencer confirmed Layser's testimony:

> Q:    Just to summarize. Ms. Phinisee knew at the time of the mediation, and before any final offer was communicated to her, that there was a lien in the amount of approximately $705,000?
> A:    Yes.
> Q:    She knew that, correct?
> A:    She knew that, apparently had even looked at the piece of paper seeing that.

Id. at 78.

Phinisee herself testified that she knew of the lien amount: "Derek left his file on the table with me, and I peeked through the file, and one of the documents had writing on it that stated that Medicaid had paid out some 700 and some odd thousand dollars." Hearing transcript, p. 122. Indeed, the document Phinisee reviewed from Layser's file specifically identifies the $704,914.12 as "Reimbursement to DPW." (Exhibit B). Even before the settlement, Phinisee was long aware of DPW's authority to collect moneys owed to Medicaid. In her application for public assistance, Phinisee signed an affidavit acknowledging that "The law provides for automatic assignment to the state of support rights for myself and others for whom I am accepting cash and/or medical assistance." (Exhibit D, DPW00048).

The Court should credit Layser and Spencer's testimony that they discussed the lien with Phinisee before she agreed to the settlement. They are highly experienced medical malpractice attorneys with more than a combined fifty years of experience. The vast majority of their cases involve lien situations, which they routinely negotiate with lien holders, including DPW. There is no reason to believe that they did not discuss the lien with Phinisee during the settlement conference.[4]

Moreover, Phinisee's own testimony supports the conclusion that she knew about the lien. She knew the lien amount, she reviewed the document identifying the money as "Reimbursement to DPW." And aside from her testimony, she previously signed a public assistance application stating DPW's authority to collect moneys to reimburse Medicaid for medical care. (Exhibit D, DPW00048). The Court can take judicial notice that Phinisee is

---

[4] Phinisee attempts to malign her former attorneys by claiming they are interested only in protecting their fees; however, this argument is nonsensical. Their fees are protected by common law under the doctrine of quantum meruit should the settlement be enforced or the case proceed to judgment in Phinisee's favor. Their concerns that the case should not proceed to trial are well-supported by the settlement judge's admonitions about plaintiffs' serious litigation risk, possibly even before trial, as Phinisee herself testified.

college-educated, well-spoken, and able to grasp medical and legal concepts. See also Spencer

testimony, p. 76 ("And Ms. Phinisee is a very bright woman and well educated. I've discussed

medicine with her over the years and legal issues over the years. She grasps them very

quickly.").

      The Court should be hard-pressed to accept Phinisee's testimony that she thought the lien

reflected only the value of Assiah's future medical expenses, not an amount owed to DPW for

past expenses. Spencer's testimony is undisputed that their primary focus was getting the best

deal possible in light of the significant litigation risk, not determining the exact amount that

Phinisee would net from the settlement:

> ....[M]y job was to get the most money I reasonably could, and if
> we could guarantee it that would be great, and I felt that the
> evaluation on the likelihood, and compared to the damages, and
> over 35 years experience and a whole bunch of these cases, I felt
> this was a fair settlement. And very much in the child's best
> interest.

Hearing transcript, p. 80.

      Phinisee's wishful thinking that she should not have to return any money to DPW,

because of her belief that the government caused Assiah's injuries, cannot be a basis to set aside

the settlement.

      At bottom, Phinisee has simply had a change of heart. This is evident in her filings,

where she states that she "would like to go to trial if the settlement amount does not increase"

(Dkt. No. 61); expresses "[d]issatisfaction with the award" (Dkt. No. 45); states that she "would

like to reject amount presented" (Dkt. No. 46); and "disagree[s] with the settlement amount and

inherent results" (Dkt. No. 47). These statements reflect Phinisee's wishes, contrary to reality,

that she had not already entered into a binding agreement. See Phinisee hearing testimony, p.

113 (her attorney said "Take the deal," and Phinisee "said okay."), and p. 125 (Q: ...you gave

21

your attorneys your authority to accept the $1.2 million, is that correct?  A:  Yes, after I had been told that we couldn't get anymore.).  It is a truism that every plaintiff believes their case is worth much more money than they ultimately receive.  But a mere change of heart can never be sufficient to set aside a settlement.  Pugh v. Super Fresh Food Markets, Inc., 640 F. Supp. 1306, 1308 (E.D. Pa. 1986).

>                4.   There is no cause to set aside the settlement based on Phinisee's newly
>                     discovered belief that the settlement should have attributed money to her own
>                     claim

Finally, Phinisee attempts to set aside the settlement because of her after-the-fact remorse that the settlement funds would not be available directly to her, but rather would be placed in trust for her daughter.  In an attempt to receive her own settlement proceeds, Phinisee now asserts that she has a claim in her own right for Assiah's past medical expenses paid by Medicaid, pointing to the case Jordan v. W. Pa. Hosp., 961 A.2d 220 (Pa. Commw. Ct. 2008).  This argument is meritless and presents no basis to set aside the settlement agreement.  Rather, Phinisee's new found theory is simply another example of her post-settlement change of heart.

Phinisee knew during the settlement conference that all of the settlement money would be put in trust for her daughter Assiah.  See April 27, 2012 email from Phinisee to Spencer, attached as Exhibit F to Phinisee's Response to Motion to Enforce, Dkt. No. 60 (discussing the amount that would be "put in trust" for Assiah and Phinisee's "concerns about how this trust actually operates.").  Moreover, she, her counsel, and Judge Rueter discussed the trust issue during the settlement conference:

> ... if the case settled for a million dollars, for example, how would
> that work in trust, would I be able to pay for things like school
> tuition, different activities for Assiah to be able to participate in
> because she can't go to school with the general population, she has
> to be around smaller groups of people. [Judge Rueter] told me
> yeah, sure, those things you need to talk to with Derek because I'm

> pretty sure he has a really good trust team that could outline those
> different things for you in a trust.

Hearing transcript, pp. 111-112.[5]

Furthermore, in pretrial litigation, defendant raised the issue that Phinisee had no claims

in her own right. Dkt. No. 42. At the settlement conference, both Judge Rueter and plaintiffs'

counsel agreed with the government's position. Layser advised Phinisee that she had no claim

because "Pennsylvania doesn't recognize that parent to child consortium." Hearing transcript, p.

66, lines 1-12. In her own filings, Phinisee confirmed that Judge Rueter told her she

> had no claim because of the type of claim it was. [My] counsel
> followed up by saying that because the plaintiff, a minor, was not a
> spouse or generates income for the household the claim does not
> apply in this case.

Dkt. No. 62 at pp. 2-3.

It is irrelevant whether or not Phinisee actually has a claim in her own right. She and her

attorneys discussed and considered this issue before entering into the settlement. She does not

get a second bite at the apple simply because she and her current attorney allege a new theory of

recovery. But in any event, Jordan provides no support for Phinisee's view that she has a claim

in her own right for Assiah's past medical expenses. Jordan addressed whether DPW could

recover medical expenses where the parents of the injured child filed their own claim outside the

statute of limitations. Jordan is not on point here because Phinisee has never paid any out-of-

pocket medical expenses for Assiah. It is undisputed that all of Assiah's medical expenses have

been, and continue to be, paid by DPW on her behalf:

---

[5] It is unclear why Phinisee would contest the concept of money being placed in trust for Assiah.
In any settlement or judgment involving a minor, the child's proceeds must be held in trust.

> Q: [THE COURT]  Is there any evidence – were you going to put
> any evidence in front of the Court that there were any such monies
> paid?
> A: [LAYSER]  No, I don't think we had any receipts or anything.

Hearing transcript, p. 53, lines 6-10.

Since Phinisee has not expended any money out-of-pocket, she has no claim to reimbursement for medical expenses paid by DPW.  See Tristani v. Richman, 652 F.3d 360, 370 (3d Cir. 2011) (". . . by allowing states to recover these expenditures, Congress both protected the public fisc and ensured that beneficiaries did not receive a windfall by recovering medical expenses they did not pay.").  Phinisee cannot point to any evidence or caselaw to support her position.

In sum, the undisputed evidence reflects that Phinisee agreed to a settlement that provided for funds to be placed in trust for her daughter.  She cannot set aside the settlement merely because she had a change of heart or invented a new theory about the strength of her claim.  This is especially true where Phinisee's actions are contrary to her daughter's interests in light of the overwhelming and undisputed testimony that the most likely result, barring a settlement, was a grant of summary judgment for defendants or a defense verdict at trial.

24

## V.    CONCLUSION

For all the reasons set forth here, and in the defendant's May 15, 2012 motion to enforce, the Court should grant defendant's motion to enforce the settlement agreement and deny Phinisee's motion pursuant to Rule 41.1(b) to set aside the settlement.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

MARGARET L. HUTCHINSON
Assistant United States Attorney
Chief, Civil Division

SUSAN R. BECKER
DAVID A. DEGNAN
Assistant United States Attorneys

Dated: July 27, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on this date I caused a true and correct copy of Defendant's Post-Hearing Brief in Support of its Motion to Enforce Settlement Agreement to be served by first-class mail, postage prepaid, upon the following:

Dennis L. Friedman, Esquire
1515 Market Street
Suite 714
Philadelphia, PA 19102
*Counsel for plaintiff Rasheena Phinisee*

SUSAN R. BECKER
DAVID A. DEGNAN
Assistant United States Attorneys

Dated:  July 27, 2012

26