IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ASSIAH PHINISEE, a Minor, | : | CIVIL ACTION |
| by and through RASHEENA PHINISEE, | : | |
| the Parent and Natural Guardian, and | : | |
| RASHEENA PHINISEE, in her own right | : | |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA | : | NO. 10-1253 |

ORDER AND OPINION

JACOB P. HART                                                                            DATE:   August 6, 2012
UNITED STATES MAGISTRATE JUDGE

I.   Introduction

    This medical malpractice case involving injuries to a minor child is assigned to the undersigned pursuant to Title 28 U.S.C. § 636(c), and Fed.R.Civ.P.73.  On April 19, 2012, a settlement conference in this matter was held before the Honorable Magistrate Judge Thomas J. Rueter.  Although both parties left the conference that day with the understanding that the case was settled, Ms. Rasheena Phinisee, the mother and natural guardian of plaintiff Assiah Phinisee, told her counsel the next morning that her consent was vitiated by their failure to adequately advise her.  She has also argued that a binding settlement was not reached at the conference.

    Defendant, the United States of America ("the Government"), filed a motion to enforce the settlement agreement.  A hearing was held on this motion on June 6, 2012, and post-hearing submissions were filed on July 27, 2012.  For the reasons set forth below, I will now grant the Government's motion to enforce the settlement agreement.

II.     Factual and Procedural Background

Rasheena Phinisee maintains that her daughter, Assiah Phinisee, developed biliary atresia, a disorder causing liver failure, as a result of her ingestion through breast milk of a medication known as Macrobid, prescribed for Ms. Phinisee at a federally funded health care clinic. At the time the case was filed, Assiah had already undergone a liver transplant, which was followed by serious complications. Recently, she underwent a second transplant at the age of four.

In a motion for summary judgment, the Government posted a serious challenge to the liability aspect of this case. According to the Government's medical experts, Macrobid has never been linked to biliary atresia, despite the fact that it is a widely used 40-year-old drug and has been subjected to thorough testing. Plaintiffs have been unable to rebut this, although their medical experts argue that the Macrobid caused a disease process in Assiah which culminated in biliary atresia.

The Government's motion for summary judgment has not been ruled upon. However, on April 11, 2012, I granted the Government's motion to bifurcate the trial, addressing only liability in the first stage. Earlier, I had scheduled trial for April 30, 2012.

As noted, the parties appeared before Judge Rueter for mediation on April 19, 2012. After nearly a day of negotiations, the government conveyed to Judge Rueter an offer of $1.2 million in settlement of the matter. Judge Rueter informed counsel for Plaintiffs of the offer, and, as even Phinisee agrees, Phinisee authorized her counsel to accept it, which they did. Hearing Transcript at 113, 125. The hearing thus ended with the agreement that the case was settled, although the Government still needed to obtain the approval of the Department of Justice Assistant Attorney General.

According to Phinisee, it was not until she went home that evening and began searching online that she discovered that the proceeds of the settlement, which were to be placed in a special needs trust for the benefit of Assiah, were subject to a Medicaid lien: "I found out that if you had any Medicaid expenses or if Medicaid paid for healthcare for your child, that you were obligated to pay those funds back." Hearing Transcript at 114.  Phinisee maintains that the lien was never disclosed to her by counsel at the settlement conference:

> COUNSEL FOR PHINISEE: Now, during the April 19th settlement conference, was there any discussion as to any obligation out of those settlement funds to repay Medicaid?
>
> PHINISEE: No.

Id. at 113.

Phinisee testified that she was disturbed by this, since her daughter's Medicaid bills were high: "When I knew that the lien was over $700,000 and that we had only settled the case for $1.2 million, to me I'm like, after my lawyer gets his fees, after Medicaid gets their lien, my daughter is left with nothing.  I didn't think it was a good offer" Id. at 115.

On the morning of Friday, April 20, 2012, Phinisee called one of her two attorneys and, as she testified: "I told him over the phone that I was unhappy with the settlement, I did not want the offer, that he had not disclosed to me a lien against it, and that I wanted to go to trial." Id. The following Monday, April 23, 2012, Phinisee sent her attorney an e-mail "expressing that [her] decision still stood not to accept the offer and to proceed to trial." Id. at 116.  In this e-mail, Phinisee repeated that counsel had not discussed the Medicaid lien with her.  Id. at 83.

3

Phinisee met with her attorneys for several hours on Thursday, April 26, 2012. Transcript at 60 (Testimony of Derek Layser) and 118 (Testimony of Rasheena Phinisee). However, there was no satisfactory outcome, and on May 7, 2012, Phinisee filed several *pro se* motions, with the intent to vacate the settlement, reinstate the case for trial, and terminate her relationship with her attorneys. On May 15, 2012, the Government filed its motion to enforce the settlement. A day later, Phinisee's counsel filed a motion to appoint a guardian *ad litem* for Assiah Phinisee in order to complete the settlement paperwork on the terms agreed upon at the April 19 mediation conference.

At the June 6, 2012, hearing on these motions, Phinisee, who was represented by new counsel, argued that she had not been informed about the Medicaid lien. Additionally, she argued that the April 19 conference could not have resulted in a binding settlement because the Government's offer was contingent upon its ability to obtain approval from the DOJ Assistant Attorney General. Because of this, Phinisee maintained, she was entitled to revoke her acceptance at any time before the Government became able to make a firm offer.[1] Finally, she argued that she had been misled by counsel into dropping claims brought in her own name.

Phinisee's two former attorneys, who testified as witnesses for the Government, testified that they did discuss the Medicaid lien with Phinisee on the day of the conference. Both of them testified that Phinisee was informed about the Medicaid lien. Derek Layser, Esq., has been practicing medical malpractice law since 1989. Hearing Transcript at 28. He testified that he "sort of has a speech" that he composed over the years regarding such liens, as follows:

> The bad news is we have to pay this lien back, whether it's Medicaid or Medicare, those are Government liens. They're in the statutes. We're required to notify, we

---

[1] The Government had obtained the necessary approval by the time of the hearing.

> as the attorneys are required to notify either the Federal Government for Medicare, State Government for Medicaid, so they're on notice. They give us information back. At the end of the case, the bad news is we have to pay the money back.
>
> The good news is that they will negotiate. They recognize that we as attorneys are getting none of the money back. There is a complicated formula based on our fees, based on our attorney's fees and the cost. Medicare is usually about 63, 64 cents on the dollar. Medicaid is more of a negotiation. At times they will reduce even further.

Hearing Transcript at 29.

More specifically, Layser said that, at the mediation, "we definitely discussed the lien." Id. at 32. He testified: "I gave the speech that I talked about before. The bad news is we're going to have to pay Medicaid back. The good news is they're going to reduce it." Id.

Layser further specified that the lien was discussed after the Government made its final settlement offer:

> COUNSEL FOR GOVERNMENT: At the point at which you had the offer communicated to you from Judge Rueter of $1.2 million plus the other conditions that we discussed ... did you then have a conversation with Ms. Phinisee?
>
> LAYSER: Yes, because we had to tell Judge Rueter well, we have to get approval from our client. So we went back with Ms. Phinisee into the, I guess it's the juror room, there's a table and chairs.
>
> COUNSEL: Can you describe in as much detail as you can that conversation?
>
> LAYSER: Well, I mean, we had multiple discussions ... But then we went through the numbers again, and why those – you know, we made our recommendations and why this was in her best interest and in Assiah's best interest. And the breakdown was again discussed, and she agreed to it before we went back in and communicated to Judge Rueter.
>
> ...
>
> JUDGE: What do you mean that breakdown again?
>
> ...

>LAYSER: Well, yes, where the settlement would go, I mean what the costs were again, where this 1.2 was going to go. And we couldn't give her an exact figure on the DPW numbers, but they would – I mean, it's very much a part of my practice that we tell people DPW is not gonna take any more than you or the child is going to get.[2] So that was the most.
>
>And I also explained to her that I thought we had, based on [another court decision], we had some very [word omitted] arguments if the DPW didn't play ball with us, that we could in our motion for Court approval of the fees and costs, that we would let it up to the Court to further to try to get the DPW lien down.
>
>COUNSEL: So the lien was specifically discussed after the last offer was made to you from the Government?
>
>LAYSER: Yes, to the best of my recollection.

Id. at 36-37.

Phinisee's other attorney, Gilbert Spencer, Esq., has been practicing law since 1979, and exclusively medical malpractice law since 1987. Id. at 69. He confirmed that "sometime that morning" of the conference, he and Mr. Layser explained the Medicaid lien to Ms. Phinisee. Id. at 78. As Mr. Spencer remembered the conference, Mr. Layser gave his "bad news/good news" speech about the lien with regards to an earlier, smaller offer. Id. at 72. He testified that, after receiving the offer for $1.2 million, "we did not re-discuss this because we didn't have to." Id. at 73. Further, as he remembered, the specific monetary breakdown was not discussed until they met with Phinisee at Mr. Layser's office, in the week after the conference. Id. at 76. Nevertheless, when asked: "But at any rate, the process of that, of negotiating with Medicaid was discussed with Ms. Phinisee before acceptance of an offer?", Mr. Spencer replied: "Oh, absolutely." Id. at 81.

---

[2] Under 62 Pa. C.S. § 1409b(11), Medicaid is entitled to recover no more than half of the recovery attributed to medical expenses, after deducting for attorney's fees, costs, and medical expenses paid by the beneficiary.

6

III.     The Settlement Agreement Is Binding On The Plaintiffs

A.     Relevant Legal Standards

A trial court has the inherent authority to enforce agreements settling litigation before it. McClure v. Township of Exeter, Civ. A. No. 05-5846, 2006 WL 2794173 at *1 (E.D. Pa. Sep. 27, 2006). Provided that the evidence demonstrates that the parties reached an agreement, a district court can enforce the terms agreed upon by the parties. Id. Settlement agreements are essentially contracts, to which the basic contract principles apply. William Metzler, 132 F.3d 937, 946 (3d Cir. 1997); and see California Sun Tanning USA v. Electric Beach, Inc., 369 Fed. Appx. 340, 346 at n. 6 (3d Cir. 2010). The federal courts apply the Pennsylvania principles of contract law to issues involving the enforcement of settlement agreements. Binder v. PPL Services Corp., Civ. A. No. 06-2977, 2009 WL 1674415 at *2 (E.D. Pa. Jun. 15, 2009).

One party's change of heart subsequent to a settlement agreement does not vitiate that agreement. McClure, supra, at *2 citing Mercer v. Richardson Brands, Inc., Civ. A. No. 91-4033, 1992 WL 164711 at *3 (E.D. Jul. 2, 1992) and Gross v. Penn Mutual Life. Ins. Co., 396 F. Supp. 373, 375 (E.D. Pa. 1975). This is true even when the change of heart occurs before an oral settlement agreement is reduced to writing. Wyndmoor Learning Ctr. v. City of Wilmington, 1996 WL 117471 at *6 (E.D. Pa. Mar. 12, 1996); and see Suber v. Peterson, 2006 WL 1582312 at **2-4 (E.D. Pa. Jun. 2, 2006). Nevertheless, a meeting of the minds is necessary to form an enforceable contract. Wyndmoor Learning Center, supra; and see Vargo v. Manus, 94 Fed. Appx. 941, 943 (3d Cir. 2004), citing Power v. Tomarchio, 701 A.2d 1371, 1374 (Pa. Super. 1997).

B.	The Medicaid Lien Was Adequately Explained to Ms. Phinisee

Ms. Phinisee's argument (other than those discussed below) is essentially that there was never a meeting of the minds because she was not informed that a Medicaid lien would attach to the amount received in settlement, or that her consent to settle was vitiated by this lack of information. She argues that, if she had known of the lien, she would have felt that the offer was inadequate and would not have accepted it.

It does not appear that Phinisee has put forth a valid argument under the principles of contract law. The Medicaid lien was not something which was required by the Defendants, or promoted by the them, and they did not have the power to eliminate it. Therefore, even if Phinisee truly was not aware of the lien, this does not seem to create an absence of a meeting of the minds between the settling parties as to the terms of the settlement. Further, there is no question of fraud or duress here, which would vitiate Phinisee's consent.

Nevertheless, despite the foregoing, it is fundamental that a plaintiff should not be lightly held to a settlement to which she did not truly agree. It is therefore still relevant that her attorneys did discuss with her the existence and effect of a Medicaid lien. Both attorneys testified credibly to this, with Mr. Spencer confirming that Mr. Layser had this conversation with Phinisee at the settlement conference, even if it was before the Government offered $1.2 million. The credibility of this testimony is enhanced by the fact that it is almost inconceivable that two very experienced medical malpractice attorneys would not be aware of the Medicaid lien, and aware that they had to explain it to their client.

This is not to say that Ms. Phinisee simply had a change of heart, which she cynically disguised by pretending she had not been aware of the lien. All evidence indicates that she was truly disturbed, and felt misled, when she focused on the effect of the Medicaid lien on the settlement. However, she was not misled. Because Ms. Phinisee was adequately advised of the existence and effect of the Medicaid lien before she agreed to the $1.2 million settlement, there is no legal basis for rescinding or otherwise undoing the otherwise binding contract for settlement.

IV.     The Settlement Was Binding Despite The Need For DOJ Approval

Ms. Phinisee has also argued that the settlement she reached with the Government on April 19, 2012, was not binding. She maintains that it was a tentative settlement contingent upon the Government's ability to obtain the approval of the DOJ Assistant Attorney General. She argues that she was therefore permitted to withdraw her acceptance at any time before this approval was obtained.

The same argument was rejected in McClure v. Township of Exeter, supra. In that case, the plaintiff argued that a binding settlement was not reached because she withdrew her acceptance prior to the ratification of her suit against the Township of Exeter by the Township Board of Supervisors. The Honorable Berle M. Schiller did not accept this analysis. Instead, he wrote, the formal ratification requirement was best described as "an implied condition precedent to the maturation of the remaining duties under the settlement agreement." 2006 WL 2794173 at *3, citing Ostman v. St. John's Episcopal Hospital, 918 F. Supp. 635, 644 (E.D.N.Y. 1996).

Judge Schiller's holding in McClure is consistent with the decision of the Court of Appeals for the Third Circuit in Main Line Theatres, Inc. v. Paramount Film Distributing Corporation, 298 F.2d 801 (3d Cir. 1962). There, the parties to an action agreed to settle based

upon the defendant's agreement to pay a sum of money to the plaintiff, contingent upon the successful settlement of eight companion lawsuits. Despite the clear existence of a contingency, the Court of Appeals found that the settlement contract was binding, and that the plaintiffs were not free to withdraw from the bargain.

Citing § 77 of the Restatement of Contracts, the court wrote: "Unquestionably, a valid bilateral contract may arise even though the promise of one party to perform is qualified by a condition other than the performance of the other party," as long as the condition did not make the promise illusory or enable the promisor to avoid performance at will. Id. at 804. The court added: "We are satisfied that the parties entered into a valid contract to settle, upon condition that the other suits be settled. Thereafter, neither party was free to repudiate the agreement during the short period required to accomplish the settlement of the other suits." Id.

Here as well, both parties were bound by the valid settlement contract, and neither Phinisee nor the Government could repudiate it during the short period during which the Government sought approval from the DOJ Assistant Attorney General. This is the usual expectation with regards to settlement agreements involving entities which need to obtain municipal approval. See Huang v. BP Amoco Corp., 271 F.3d 560 (3d Cir. 2001) (defendant was obligated by Pennsylvania's implied covenant of good faith and fair dealing to seek third-party approvals, when it had contractually agreed to do so). Accordingly, the settlement agreement reached on April 19, 2012, was binding.

In support of her argument that the settlement was only tentative, Phinisee has cited several cases which explain that not every government employee has the actual authority to bind the United States to a contract. Peninsula Group Capital Corp. v. United States, 93 F. C. 720, 2010 WL 3069 (Fed. Cir. 2010); Trauma Services Group v. United States, 104 F.3d 1321, 1325

(Fed. Cir. 1997) ("Anyone entering into an agreement with the Government takes the risk of accurately ascertaining the authority of the agents who purport to act for the Government, and this risk remains with the contractor even when the Government agents themselves may been unaware of the limitations on their authority").

These cases are inapposite. There is no suggestion here that the attorneys for the Government misrepresented or misunderstood their authority, or even that Phinisee was misled as to their authority.

In another decision relied upon by Phinisee, Atasanoff v. Lower Dauphin School District, Civ. A. No. 05-513 (M.D. Pa. Feb. 14, 2006), a court found that a settlement agreement with a school district was not binding until it was approved by the local school board, and that the plaintiffs therefore had the right to change the terms of their acceptance before the approval was obtained. This case, which has never been reported or cited, much less relied upon, and is not binding upon this court, can be distinguished by the fact that the mediator was careful to report to the court that the settlement was only tentative, pending approval. To the extent that Atasanoff suggests that no settlement is binding before a municipal approval is obtained, I do not accept its reasoning. It fails to take into account how difficult and chaotic it would be to settle any case involving a government entity if this rule were generally accepted.

V.      Other Alleged Misinformation

Finally, Phinisee has pointed to other alleged flaws in her counsel's advice that she argues justify invalidating the settlement:

> Phinisee was not informed that Medicaid could recover any money remaining the special needs trust after Assiah's death. There were no discussions of pain, suffering or loss of life's pleasures or the value of that. There were no discussions on the restrictions of monies placed in the special needs trust. Phinisee also was not informed that she had a substantial claim in her own right. She did not waive

> her claim and did not settle her claim. Under law, Phinisee has the ability to seek compensation for past and future medical expenses incurred in the care of a minor child until the age of majority.

Plaintiff's Brief In Opposition To Defendant's Motion to Enforce Settlement Agreement at 8.

First, Phinisee has not pointed to any law which would support her argument that a settlement agreement to which she explicitly agreed could be revoked later because of her second thoughts as to the wisdom of her attorney's advice. On the contrary, as discussed, a party's change of heart subsequent to a settlement agreement does not vitiate that agreement. McClure, supra, at *2 citing Mercer v. Richardson Brands, Inc., Civ. A. No. 91-4033, 1992 WL 164711 at *3 (E.D. Jul. 2, 1992) and Gross v. Penn Mutual Life. Ins. Co., 396 F. Supp. 373, 375 (E.D. Pa. 1975). Because Phinisee did not mention these grounds for dissatisfaction until the day of the June 6, 2012, hearing, I have no hesitation in finding that they are nothing more than second thoughts.

Secondly, the advantage Ms. Phinisee seems to think she would have obtained by bringing a claim in her own name to recover for medical expenses is illusory. Nothing can change the fact that all medical expenses in this case were paid by Medicaid, which will exercise its lien to recover them. The lien would simply be paid out of Ms. Phinisee's recovery, rather than her daughter's. Assiah's recovery would then not include any amount for medical expenses.

As for settlement, the Government offered $1.2 million *taking into account* the medical expenses. It would not have given some extra amount if Rasheena Phinisee had asserted a claim in her own name. The fact is that the amount the Government was willing to offer in settlement was limited in accordance with the weakness in Phinisee's evidence on liability, and not because of anything to do with the disposition of the settlement proceeds.

VI.     Conclusion

In accordance with the foregoing discussion, I will enter an order granting the Government's Motion to Enforce Settlement.

BY THE COURT:

/s/Jacob P. Hart

_____
JACOB P. HART
UNITED STATES MAGISTRATE JUDGE